[No. F015482. Fifth Dist. Apr. 21, 1992.]

TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, Petitioner, v. PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent; STATEWIDE UNIVERSITY POLICE ASSOCIATION et al., Real Parties in Interest.

COUNSEL

Bruce M. Richardson, William B. Haughton and Sonny Lo for Petitioner.

John W. Spittler, Robert G. Thompson and Andrea H. Jespersen for Respondent.

Mastagni, Holstedt & Chiurazzi and Mark R. Kruger for Real Parties in Interest.

OPINION

MARTIN, Acting P. J.—Petitioner Trustees of the California State University (University) seeks writ of prohibition/mandate (Gov. Code, § 3542) to

compel respondent Public Employment Relations Board (PERB or Board) to dismiss an unfair labor practice charge arising from rejection of a probationary police officer.

On June 29, 1988, real parties in interest, Gilbert Washington, Jr., and his labor union, the Statewide University Police Association (SUPA), filed an unfair practice charge (case No. S-CE-35-H) against petitioner under the Higher Education Employer-Employee Relations Act (Gov. Code, § 3571, subds. (a)-(d)) (HEERA). Real parties specifically alleged petitioner rejected Washington from probation as a California State University, Fresno (CSUF), police officer in retaliation for his testimony on behalf of a fellow officer at a formal PERB hearing (unfair practice case, PERB Nos. S-CE-32-H and S-CE-33-H).

On August 18, 1988, real parties withdrew their allegations regarding a violation of Government Code section 3571, subdivisions (c) and (d) without prejudice.

On August 23, 1988, the PERB Office of General Counsel issued a complaint alleging petitioner took adverse action against real party Washington by rejecting him from continued employment during his probationary period. The complaint alleged petitioner took the adverse action because of Washington's exercise of his right to testify at a formal PERB hearing on June 22, 1988, a protected activity. Petitioner timely answered the PERB complaint.

After an extended contested hearing, a PERB Administrative Law Judge (ALJ) issued his proposed decision and dismissed the unfair practice charge and complaint. The ALJ stated in relevant part:

"A combination of the timing of the rejection, inconsistencies in the employer's actions and the inadequacies of the investigation into Washington's capabilities all lead to a conclusion that the Charging Party has presented a prima facie case of discrimination.

"The FSPD [Fresno State Police Department] insists that it had an operational justification to take the action that it did. It insists it has a right to either accept or reject any probationary employee it chooses. There is no serious dispute with that statement. It is only where there are allegations that such actions were taken in retaliation for protected activities that PERB becomes involved.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"In this case, the FSPD had an employee whose past employment record had been somewhat inconsistent, at best. He had some definite strengths and yet several consistent and persistent weaknesses also showed themselves. The FSPD failed to meet the most minimum of standards in documenting Washington's police officer performance throughout his employment. . . .

". . . [T]he FSPD still has evidence of a probationary employee who (1) was rejected in probation from two previous employers, (2) has mixed 'recommendations' from his previous supervisors, (3) had a series of Internal Affairs incidents when he was with the Sheriff's Office, (4) engaged in a loud confrontation with his supervisor when discussing a performance report, (5) embarrassed the FSPD by twice disrupting an important security briefing, and (6) [FSPD] Chief Anderson believes, not only referred to his supervisor in the most derogatory of terms but consistently lied about it.

"Based on all of the above, it must be concluded that the FSPD has manifested a sufficiently plausible operational justification for the rejection of Gilbert A. Washington, Jr. from his position as a peace officer at the CSUF. The Charging Party was unable to prove, by a preponderance of the evidence, that the rejection of Washington was due, in whole or in part, to his protected activities."

On October 23, 1989, real parties filed exceptions to the ALJ's proposed decision and petitioner duly filed its response to the statement of exceptions.

On October 4, 1990, respondent filed PERB decision No. 845-H which reversed the proposed decision of the ALJ. Respondent stated in relevant part:

"Based on the inconsistent testimony and the FSPD's failure to meet the most minimum of standards in documenting Washington's performance throughout his probationary period, the Board finds CSU failed to present credible evidence of an operational justification for Washington's rejection from probation. Accordingly, the Board finds the charging parties proved, by a preponderance of the evidence, that Washington's rejection from probation was due to his protected activity." Respondent directed the reinstatement of real party Washington as an FSPD officer and ordered other affirmative actions to effectuate the policies of HEERA. Petitioner filed a request for reconsideration of PERB Decision No. 845-H, alleging prejudicial errors of fact, and on February 13, 1991, respondent issued PERB Decision No. 845a-H which denied the request for reconsideration.

On March 5, 1991, petitioner filed a petition for writ of review with this court. On September 24, 1991, this court directed issuance of a writ of

review returnable before the court on January 14, 1992, at 1:30 p.m. (Cal. Rules of Court, rule 59.) On December 10, 1991, this court changed the date of oral argument to Monday, March 16, 1992.

FACTS

The following facts are taken substantially from the proposed decision of the ALJ and PERB Decision No. 845-H.

The FSPD hired real party Washington as a public safety officer effective July 13, 1987. The position had a one-year probationary period. Washington had peace officer experience prior to that hiring. He spent three years with the Washington, D.C., Metropolitan Police Department, two years as a cadet and one year as a probationary patrol officer. The Metropolitan Police Department rejected him at the end of the probationary period. Washington explained, "[I]t was my first job out of high school and I was still young and immature." He also admitted he was "quick with the mouth, slow with the brain."

Washington also spent four years in the United States Air Force Military Police and nine months as a student intern with the California Department of Alcoholic Beverage Control. In addition, he was employed for 10 months as a Deputy United States Marshal. Washington was rejected during his probationary period in the latter position because he was caught sleeping during the transportation of a suspect from Los Banos to Fresno. Immediately prior to his employment by FSPD, Washington served as a Fresno County deputy sheriff for eight years.

Sergeant Richard Snow of the FSPD conducted a background investigation of Washington prior to his employment. Snow contacted three lieutenants and five sergeants from the Fresno County Sheriff's Office. These officers either worked with and/or supervised Washington. Two officers insisted Washington was an excellent officer. They were enthusiastic about Washington's performance when he worked with them. A third officer reported no problems. The fourth said Washington's problems were "really supervisors' problems. I'd have him work with me anytime." The fifth officer said ". . . no real problems . . . minor report difficulty . . . takes a lot of supervising." The sixth said ". . . takes things personal . . . tries to get around the rules . . . had slow response times." The seventh officer commented "won't take responsibility for his actions . . . some minor report writing problems." The last stated ". . . lots [o]f supervision . . . tests the waters . . . continual problems."

The sheriff's office conducted three or four internal affairs investigations of Washington during his eight years in that department for which he

received several reprimands and he was removed from the canine unit for unsatisfactory conduct. Despite these reports, Snow stated in his FSPD evaluation that he "found no significant and lasting problems." Snow elaborated: "It would appear that WASHINGTON is dependable and interested in helping people. He seems sincere in his desire to assist the public and [should] be well suited to the campus community style of police work."

The FSPD placed Washington under the supervision of Sergeant Larry Foote and assigned Corporal Margie Hernandez, a field training officer, to monitor Washington's transition from deputy sheriff to university police officer. She worked directly with Washington for approximately four weeks and believed he was a safe and knowledgeable officer who had good rapport with the public. Hernandez said he was very trainable and open to suggestions on how to improve his performance. Washington's report writing was acceptable and any problems were normal to new officers in the department. Hernandez said there was no need to teach Washington general police procedures, only the university policies and procedures. Hernandez was aware of Washington's conflicts with Officer Guadalupe Canales, another FSPD officer on the graveyard shift. Canales had recently joined the FSPD and, in Hernandez's opinion, was a little "badge heavy." In other words, Canales attempted to throw her weight around due to greater seniority in the department. Hernandez counseled Washington to just keep doing his job.

Hernandez worked at the Kingsburg Police Department prior to her employment at FSPD. She trained five officers in Kingsburg but Washington was the first officer she trained at FSPD. She rated Washington above average as an officer and believed he should not have been terminated. Officers Raymond Mendoza and David Jensen, both SUPA members, testified Washington was an excellent police officer and there was no legitimate reason to reject him. Jensen, a 17-year law enforcement officer, proofread some of Washington's reports and found them legible, concise, and complete. Dan Horsford, a FSPD investigator, considered Washington a good officer with respect to the mechanics of the job. However, he noted Washington had troubles with two coworkers, Officer Canales and Sergeant Maria Silva. Horsford concluded these troubles affected Washington's attitude and job performance. Horsford said he, himself, had had problems with Canales in the past and complained about her cockiness, her loud voice, and her general attitude.

Sergeant Foote gave Washington his first probationary evaluation on October 2, 1987. He received a rating of "M" in six general categories— ability, work habits, relationships with others, attitude, adaptability, and

personal attributes. The "M" rating signified Washington "[f]ully meets expected standards." Foote commented Washington was well organized; had all equipment and forms with him to do the job; did neat and complete report writing; got along well with all employees; easily adapted to any assignment; always appeared neat; and displayed a lot of control. Foote made no negative comments in the report and concluded Washington had "rapidly adapted to working on campus."

Prior to the preparation of Washington's second probation evaluation report, Sergeant Foote became ill and was replaced by Sergeant Silva. Silva had been Washington's supervisor for two to four weeks when she prepared the second evaluation report on January 14, 1988. Silva claimed Sergeant Foote had given her some negative information about Washington's job performance. However, she declined to include it in his evaluation report because she did not personally witness any of the incidents. The narrative portion of Sergeant Silva's evaluation report stated in relevant part:

"[(1)] His reports are neat, clear, and concise most of the time. His report kick-back is approx. 10% . . . . He requires minimal supervision.

"[(2)] He works willingly with no short cuts and is dedicated to follow through.

"[(3)] He has good open two way communication with most of the employees. . . .

"[(4)] He accepts constructive criticism. . . .

"[(5)] He is making the transition from deputy sheriff to campus law enforcement with no problems.

"[(6)] He handles changes in a mature manner . . . . He makes sound decisions in dealing with his work."

Sergeant Silva did not make any negative comments in the report. She and Washington discussed and signed the report on February 21, 1988. Washington's ratings in the six general categories were all within the "[f]ully meets expected standards" rating. Some of the markings almost abutted the "[c]onsistently exceeds expected standards" rating area on the evaluation form.

Silva and Washington met again on March 23 to discuss his performance and an upcoming informal evaluation. Silva had already prepared a tentative written evaluation. The informal evaluation form differed from the formal evaluation form. Each of the six general categories on the latter form were

divided into four to six subcategories on the informal form. Each subcategory received an individual rating. Washington received 31 separate ratings. Seventeen of these ratings were in the "average" range, eleven in the "good" range, two in the "excellent" range, and one rating was in the "improvement needed" range. The latter rating was for "organization." The "excellent" ratings were in "Knowledge" and "Relationships with Supervisors."

Silva's narrative comments discussed Washington's acceptable and unacceptable traits. Silva noted Washington was an "easy going individual, accepts changes and modifies his behavior, takes pride in his work and appearance, lowest sick leave for shift, orderly." She also stated "report writing time frame to [sic] long, paperwork logs not turned in on time. Too formal in report writing." In the general comment section, Silva stated Washington's "formality in his reports has decreased and [he] is using first person writing style more." Washington was in the ninth month of his twelve-month probationary period at this time. Washington signed the form and inserted the following statement: "I have discussed with [Sergeant] Silva the points marked improvement needed and I do not concur with her assessment."

Silva claimed she originally had three or four categories marked "Improvement Needed." She changed them after her March 23 meeting with Washington because she thought she was being too harsh. However, she also claimed the meeting confirmed her view that Washington was untrainable. Silva met with Lieutenant Steven King and asked if it was possible to extend Washington's probationary period. King told her the probationary period could not be extended.

Sergeant James Myers and Investigator Michael O'Reilly heard Washington shouting at Silva during the March 23, 1988, meeting. Silva did not tell Lieutenant King that Washington had been verbally abusive. Rather, she told King that Washington became upset and made facial grimaces. King instructed Silva to prepare a memorandum documenting the problems with Washington's performance. However, neither the informal evaluation nor the memo mentioned Washington's conduct during the March 23, 1988, meeting. Washington received the final written informal evaluation on April 9, 1988.

In early May 1988, Washington contacted the Clovis Police Department and discussed employment possiblities with that agency. Clovis Police Chief John Maskovitch interviewed Washington for a position. Washington asked to be informed prior to any contact with the FSPD regarding a job reference. Washington explained he wanted the news about the possible employment

change to come from him and not the Clovis Police Department. Chief Maskovitch informed Washington he had already discussed the matter with FSPD Chief William Anderson earlier that day. Washington spoke to Chief Anderson the next day. Anderson asked whether Washington was thinking about leaving. Washington said he had given it some thought and inquired about the status of his probationary period. Anderson said from what he knew there should be no problem with a successful completion of his probation. Anderson added he wanted to see Washington stay with the department. Washington said he would like to stay but was concerned about the completion of his probationary period.

Anderson told Lieutenant King he was pleased he had been able to talk Washington into staying with the FSPD. At this point, King told Anderson there had been some difficulties with Washington. Anderson had been assigned to a special task force on campus disaster preparedness from January to May 1988 and, thus, had not been in contact with the day-to-day operations of the FSPD during that period. Anderson directed King to organize a meeting of all the sergeants to bring him up to date on Washington's probationary status.

Due to the unavailability of some of the sergeants, the meeting was not held until June 6, 1988. King, Silva, and Snow spoke at the meeting and most of their information was negative. Anderson assigned Washington to two weeks of further field training under the supervision of Sergeant James Myers. King did not agree with this decision. He believed the two-week training assignment was too easy to complete and inadequate to cure Washington's long-standing problems.

On June 7, 1988, Anderson wrote a memorandum to Washington and arranged an all-day meeting with King and Washington to discuss the contents of the memo. The memo stated in relevant part:

"In the last two weeks, several complaints have been filed with me about your performance as a police officer. These complaints have come from Sergeants, other police officers, dispatchers, and civilian personnel. Apparently these individuals have tried to work the problem out with you first, but you have been uncooperative in accepting responsibility for your actions.

"Unless the following areas are corrected by July 1, 1988, you may not pass your probation period:

"1. Report Writing:

"a. Not following department procedures.

"b. Arguing when attempts are made to correct your mistakes.

"c. Complaining to other employees about the Sergeants harassing you about your reports.

"2. Radio Procedures:

"a. Failure to answer your radio promptly.

"b. Rude or angry responses to calls.

"c. Not checking on the air when finished with calls.

"d. Not checking off the air when away from patrol car.

"3. Not Following Proper Rules and Procedures:

"a. Reports late.

"b. Extended breaks, 40 minutes to 60 minutes beyond allotted time.

"c. Ignoring instructions and orders, belittling Supervisors who try to correct you in front of other officers and civilians.

"d. Questionable arrest procedures.

"4. Interpersonal Relationships:

"a. Rude to fellow workers.

"b. Insubordinate to Sergeants; also when they are not present by saying demeaning remarks to other employees about the Sergeants.

"5. Poor Organization of Time:

"a. Reports not turned in on time.

"b. Assignments not completed or ignored."

Anderson's memorandum to Washington was based on numerous incidents allegedly occurring during the preceding eight to ten months but, for the most part, not reported or reflected in the periodic reports and evaluations of Washington's progress as a probationary officer. Officer Canales was

assigned to the same shift, although not the same patrol vehicle, as Washington. The two officers did not get along very well. In the fall of 1987, Canales complained to Sergeant Foote about Washington sleeping on patrol, playing a personal radio in violation of a sergeant's orders, consistently responding slowly to radio calls and failing to call in on the radio during traffic stops. Canales believed Washington followed the rules when the supervisors were nearby but ignored them when the supervisors were not on campus. Washington denied sleeping on duty and playing the radio. Canales complained about Washington to Silva. She was upset about his slow radio response time and repeated her earlier complaints about his sleeping on duty and playing a personal radio.

Washington had some difficulties with FSPD dispatcher Deborah Stamp. Stamp did not personally testify. However, she reportedly told a number of supervisors that Washington had been rude over the radio. Silva heard at least one instance of this rudeness when she was in the FSPD headquarters. Hernandez also heard one instance of rudeness. Washington admitted to being rude on at least one occasion. He was busy trying to sort out a number of tasks when the radio dispatcher kept asking him for information. He responded in a curt and rude manner. Washington insisted he later apologized to Stamp for his conduct.

Four other dispatchers, three full-time and one part-time, insisted they never heard Washington speak in such a manner on the radio. They said he was helpful and prompt in his responses to their inquiries. At least two of them said he was an excellent police officer. The dispatchers were surprised by Washington's rejection and attributed it to other circumstances. One dispatcher said Sergeant Snow was the leader of a group of antiunion (SUPA) police officers within the FSPD. Snow's group was opposed to a rival group of pro-SUPA police officers. Officer Canales and Sergeant Silva were part of Snow's group. Washington seemed to be aligned with the pro-SUPA group.

Another incident concerned the visit of then-Vice-President George Bush to the CSUF campus. Prior to the visit, Secret Service agents held a briefing with FSPD officers. Washington interrupted the briefing with either laughter or loudly whispered comments on two occasions. Others present directed him to stop such activity. Washington agreed he was admonished twice but maintained he was chuckling over the Washington, D.C., accent of one of the Secret Service agents.

In late May 1988, Tyrone Jones, a campus guard for nine years, told Silva that Washington had been "belittling [her] in a . . . disrespectful manner:

such as '[t]hat broad don't know anything about being a supervisor and I don't need that broad to back me up.'" Washington denied making these comments. Chief Anderson believed Jones because the latter had previously told the truth under circumstances that were extremely unfavorable to Jones.

Washington completed two weeks of field training under the direct supervision of Sergeant Myers between June 13 and June 24, 1988. Myers filed a daily observation report rating Washington in 30 separate categories. The rating scale ranged from a low of (1), meaning "not acceptable by FTO [field training officer] program standards," to a high of (7), meaning "superior by FTO program standards." A rating level of (4) was considered an "acceptable level." Most of Myers's ratings of Washington were at the (4) level although there were some at the (3) level. Myers gave Washington seven (6) ratings and three (5) ratings for his "General Appearance." He gave seven (3) ratings during the ten-day field training period. One had to do with "Acceptance of Criticism: Verbal/Behavior." Four of Washington's negative ratings related to completion of forms and/or report writing. Myers briefly indicated Washington needed to make minor corrections or use a different category in a report. The only other two negative ratings concerned "Officer Safety: General." In one instance, Myers noted Washington set out "a poorly designed flare pattern at the scene of a drunk-auto." In the other, during "a traffic stop, Officer Washington positioned himself in an unsafe position with the driver of the vehicle."

In the narrative portion of the reports, Myers included many positive comments regarding Washington's relationship with civilians on campus. Myers commented on the slowness of the activity on campus during this 10-day field training period. In addition, Myers noted "On the mechanics of the job, Officer Washington is a good officer but there are other areas he needs to work on." Myers did not explain the nature of those "other areas."

On June 22, 1988, Washington testified pursuant to subpoena at a formal hearing in *SUPA* v. *The Trustees of the California State University*, PERB case Nos. S-CE-32-H and S-CE-33-H. That case concerned the suspension of Officer John Moseley, Washington's colleague and SUPA job steward, for the exercise of alleged protected union activity under HEERA. Chief Anderson attended all eight days of the formal hearing in that case. After hearing, the ALJ found for SUPA and ordered CSUF to reinstate Moseley with full pay and allowances. The PERB ultimately found CSUF had violated HEERA and ordered it to make Moseley whole.

The ALJ's proposed decision noted factionalism in the FSPD:

"Throughout the entire period under question in this case, 1982 to the present, there have been two separate and distinct factions in the Fresno State campus police department. Most of the witnesses have acknowledged it. Even Chief Anderson admitted it. Officers [Moseley], David Jensen and Raymond Mendoza headed one faction. Snow, Maria Silva and her husband, Sergio Silva, headed the other. Snow and Maria Silva were able to obtain, initially, the support, and eventually the promotions, from the administration. [Moseley] had a majority of the officers' support and became SUPA's leader."

After the completion of Washington's 10-day field training session, Chief Anderson met with the involved supervisory personnel. Sergeant Myers concluded Washington "cannot function independently at this time." Sergeants Silva and Snow and Lieutenant King all recommended Washington's rejection during probation. On June 28, 1988, Washington received his third formal evaluation from Sergeant Silva. A rating of "I" meant "[i]mprovement needed to meet expected standards." A rating of "M" meant "[f]ully meets expected standards." Washington received an "I" rating in (1) Abilities, (2) Work Habits, (3) Attitude, and (4) Adaptability. He received a rating midway between "I" and "M" in "Relationships with Others." He received an "M" rating for "Personal Attributes."

Silva noted a deterioration in Washington's performance since his informal evaluation in April 1988. The supervisor elaborated in the narrative portion of the report:

"1. Ability: He is familiar with the common code sections. His report return rate is approximately 50%; this is unacceptable. He needs to organize his time to finish his reports before the end of the shift. His reports are generally neat, but often are missing information or do not follow department format. He possesses the skills and knowledge to do the job, but does not use them fully.

"2. Work Habits: He is observant of most rules and regulations, but he needs to follow them at *all* times. He will disregard rules and regulations if no supervisor is on duty. He needs to use good etiquette in his radio transmissions.

"3. Relationships with Others: He is rude to dispatchers and other personnel in his radio traffic. He has been generally effective in accomplishing his duties when dealing with the public.

"4. Attitude: He needs to be reminded about a procedure like report writing or assignments several times. He becomes argumentative when

suggestions for improvements are made, and will question directives and department policies. He tends to be pessimistic. He needs to conform to the department rules and regulations.

"5. Adaptability: He questions changes and rules. He has not made the transition to University policing. He has had problems adjusting to different personnel and factors in the job environment. He is argumentative with personnel who have tried to help him adapt to our work environment and procedures.

"6. Personal Attributes: His appearance is neat. He shows good physical condition."

On June 27, 1988, the FSPD rejected Washington from his probationary position as a university police officer. The rejection was effective on July 12, 1988.

### Discussion

#### I. Was Respondent's Finding of Protected Activity Supported by the Administrative Record?

 Petitioner contends respondent's findings do not support the conclusion the FSPD rejected Washington due to his protected activity.

The Legislature adopted HEERA in 1978. (Stats. 1978, ch. 744, § 3, p. 2312 et seq.) The act granted collective bargaining rights to employees in the state university and the University of California systems. Respondent PERB is the administrative agency charged with administering the provisions of HEERA. (Gov. Code, § 3563; *Regents of University of California* v. *Public Employment Relations Bd.* (1985) 168 Cal.App.3d 937, 939 [214 Cal.Rptr. 698].) PERB is an independent state administrative agency created by the Educational Employment Relations Act (Gov. Code, §§ 3540-3548) to administer employer-employee disputes arising within the public school systems in the State of California. (Gov. Code, § 3540.) PERB has original jurisdiction to determine claims of unfair labor practices (Gov. Code, § 3541.3, subd. (i)), and is empowered to issue decisions and orders upon its finding of an unfair labor practice. (Gov. Code, § 3541.5, subd. (c).) Review of PERB orders is by way of petition for extraordinary relief directly to the Court of Appeal. (Gov. Code, § 3542.) Review is administered by the Court of Appeal, generally, as are proceedings involving other extraordinary writs. (Gov. Code, § 3542, subd. (c).) (*San Diego Adult Educators* v. *Public Employment Relations Bd.* (1990) 223 Cal.App.3d 1124, 1127, fn. 1 [273 Cal.Rptr. 53].)

Government Code section 3571 states in relevant part:

"It shall be unlawful for the higher education employer to do any of the following:

"(a) Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees *because* of their exercise of rights guaranteed by this chapter. . . ." (Italics added.)

■ The relationship of a reviewing court to an agency such as PERB is generally one of deference. Such deference is mandated by HEERA itself. The findings of the Board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive. (Gov. Code, § 3564, subd. (c).) Judicial review of a labor board's determinations under the substantial evidence standard is limited. The reviewing court does not reweigh the evidence. If there is a plausible basis for the board's factual decisions, the reviewing court is not concerned that contrary findings may seem equally reasonable, or even more so. The reviewing court will uphold the board's decision if it is supported by substantial evidence on the whole record. Under the substantial evidence standard, when a labor board chooses between two conflicting views, a reviewing court may not substitute its judgment for that of the board. (*Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617-618 [224 Cal.Rptr. 631, 715 P.2d 590].)

■ To state a prima facie case of discrimination or retaliation, the charging party must show (1) he or she engaged in protected conduct known to the employer; (2) the employer took adverse action against the charging party; and (3) the adverse action was unlawfully motivated, i.e., taken because of the charging party's exercise of protected activities. (*Novato Federation of Teachers* v. *Novato Unified School District* (Apr. 30, 1982) PERB Dec. No. 210, at pp. 4-6.)

Petitioner contends on review:

"The word 'because' is crucial. It requires the Board to find that the exercise of a protected activity *caused* the State employer to take reprisals against an employee, before the Board can conclude that an unlawful labor practice occurred. In other words, the mere fact that an employee exercised a protected activity, and later is rejected during probation, is not evidence of an unlawful labor practice, unless there is a finding of a cause and effect relationship between the two events.

"In this case, the Board found that Washington was subpoenaed by another employee to testify at another Board hearing. The Board also found that Washington obeyed the subpoena. However, there is no finding by the Board that Washington gave any testimony that was negative, much less harmful, to Petitioner University, or that he said anything helpful to the subpoenaing party. In fact, there is no finding by the Board as to what Washington said at the hearing.

"In order to fill in the gap left by the Board, the Court is required to speculate that Washington said something at the June 22, 1988 hearing which *caused* Petitioner University to reject him during probation. Neither such gap by the Board, nor such speculation by the Court, is legally permissible.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Absent a finding that Washington's testimony before the Board was somehow negative against Petitioner University, the Board's conclusion that Washington's rejection during probation was 'due to' his testimony is not supported by the Board's findings."

In our view, petitioner's argument must fail. ■ Unlawful motive is the specific nexus required in the establishment of a prima facie case. Direct proof of motivation is rarely possible since motivation is a state of mind which may be known only to the actor. Unlawful motive can be established by circumstantial evidence and inferred from the record as a whole. To justify such an inference, the charging party must prove the employer had actual or imputed knowledge of the employee's protected activity. Knowledge along with other factors may support the inference of unlawful motive. The timing of the employer's conduct in relation to the employee's performance of protected activity, the employer's disparate treatment of employees engaged in such activity, its departure from established procedures and standards when dealing with such employees, and the employer's inconsistent or contradictory justifications for its actions are facts which may support the inference of unlawful motive. In general, the inference can be drawn from a review of the record as a whole. (*Novato Federation of Teachers* v. *Novato Unified School District, supra,* PERB Dec. No. 210, at pp. 6-7.) The board's expertise entitles it to considerable deference in deciding the question of motivation. (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 757 [195 Cal.Rptr. 651, 670 P.2d 305], cert. den. 466 U.S. 972 [80 L.Ed.2d 819, 104 S.Ct. 2345].)

■ In its statement of decision, the PERB first outlined a detailed and thoughtful analysis of all of the evidence presented at the hearing before the

ALJ, much of which we have recited in our statement of facts. In the course of that analysis, the PERB stated:

"On June 28, 1988, Washington received his third formal evaluation. This evaluation evidenced a dramatic drop in Washington's performance as a police officer at the FSPD. As the previous evaluations were good or, at the very minimum, satisfactory, this evaluation seems suspect. This is especially true in light of the fact that this evaluation was given only six days after Washington testified at the PERB formal hearing. On the same day, Washington received his notice of rejection from probation, effective July 12, 1988.[5] Thus, the actual date that CSU had knowledge of the subpoena does not change the fact that Washington was given his third formal evaluation and notice of rejection six days after he testified at the PERB formal hearing. On this basis, the Board finds that the proximity of time between the participation in protected activity and Washington's rejection from probation support an inference that there was a causal relationship between these two circumstances." Footnote 5 stated: "It is interesting to note that the notice of rejection was dated June 27, 1988, one day *before* Washington's third formal evaluation."

And later the PERB stated:

"Finally, the investigation of Washington's capabilities and potential value to the FSPD was inadequate. The investigation was confined to the last 30 days of his employment and completed in a hurried nature. The combination of the timing of Washington's rejection from probation, inconsistencies in the FSPD's actions, departure from established procedures, and inadequacies of the investigation of Washington's performance lead to the conclusion that the charging parties presented a prima facie case of discrimination."

Thus, respondent's finding of protected activity and a causal relationship between such protected activity and Washington's discharge is, in our view, amply supported by the record and petitioner's argument in this regard is rejected.

Petitioner further contends in its reply brief:

"Petitioner University is not alleging that the Board's findings are not supported by substantial evidence. Rather, Petitioner University is alleging that the Board's conclusion is not supported by its findings.

"In its administrative decision, the Board concluded that '[Petitioner] rejected Washington from probation in retaliation for his having testified at a

[Board] formal hearing involving a fellow campus police officer, John Moseley.' Administrative Record, Vol. I, p. 2. However, the decision lacks a crucial finding of fact: WHAT DID WASHINGTON SAY AT THE MOSELEY HEARING?

"In order to make its conclusion of retaliation, the Board assumes that Washington's testimony was helpful to Moseley, or harmful to Petitioner University. However, the Board made no such finding of a 'motivating factor.' *Novato Unified School District* (1982) PERB Decision No. 210 . . . . The absence of such a finding is fatal to the Board's conclusion.

"Obviously, if Washington's testimony at the Moseley hearing had been neutral, or helpful to Petitioner University, or harmful to Moseley, then his rejection from probation could not possibly have been in retaliation for his testimony.

"Absent a finding concerning the substance of Washington's testimony at the Moseley hearing, the Board's conclusion that Petitioner University retaliated against Washington for testifying at that hearing is not supported by the findings."

Judicial notice may be taken of the records of any court of this state. (Evid. Code, § 452, subd. (d)(1).) On July 26, 1991, this court summarily denied the university's petition for writ of review in the Moseley matter (*Trustees of the California State University* v. *Public Employment Relations Bd.*, No. F015083). A review of the administrative record in that matter reveals Washington was called as a witness on behalf of Moseley on June 22, 1988. Washington testified he (1) witnessed a verbal altercation between Moseley and Lieutenant King in the FSPD locker room on February 5, 1988; (2) considered Moseley a capable, competent officer and did not "have any problems working with him"; (3) believed Moseley was subject to FSPD scrutiny because of his SUPA activities; (4) deferred joining SUPA on the advice of Moseley because "around the department it's usually admin versus union"; and (5) ultimately joined SUPA during his probationary period because he needed "representation and protection."

The CSUF director of personnel services transmitted a formal notification of rejection to Washington on June 27, 1988, five days following the above described testimony. Moseley recalled Washington as a witness on July 19,

1988. Washington described the circumstances of his rejection on probation to the ALJ[1] and concluded:

"I think the main reason [for rejection on probation] was the fact that I testified for Officer Moseley. That, I think, is the big reason, is the number one reason. And if for some reason Officer Moseley doesn't make it through this, I also feel that they [FSPD] probably believe that the way I put it is Officer Moseley won't be dead; he'll be alive and well and living in my body, for lack of a better analogy."

The ALJ stated in the proposed decision of September 14, 1989: "His [Washington's] testimony was generally supportive of the charging party [Moseley] and against the position(s) tak[en] by the respondent [Trustees of the California State University]." The PERB did not incorporate this language in its initial decision, or in its decision on request for reconsideration. And, a careful reading of the administrative record reveals petitioner did not raise the alleged error in its request for reconsideration. Rather, petitioner raised the issue for the first time in its briefs on review.

Title 8, California Code of Regulations, section 32410, subdivision (a), states in relevant part:

"Any party to a decision of the Board itself may, because of extraordinary circumstances, file a request to reconsider the decision within 20 days following the date of service of the decision. . . . The grounds for requesting reconsideration are limited to claims that the decision of the Board itself contains prejudicial errors of fact, or newly discovered evidence or law which was not previously available and could not have been discovered with the exercise of reasonable diligence."

■ In our view, petitioner has waived its claim of error by filing the request for reconsideration without asserting the PERB's omission as a prejudicial error of fact. Had petitioner done so, respondent Board could have bridged any "analytical gap" which petitioner found in the Board's decision. Therefore, petitioner is precluded from raising this issue for the first time on this review.

However, even assuming arguendo no waiver, petitioner's argument must be rejected. The findings of the PERB with respect to questions of fact, including ultimate facts, are conclusive if supported by substantial evidence on the record considered as a whole. (Gov. Code, § 3542, subd. (c).) And, as previously stated, petitioner concedes it "is not alleging that the Board's

---

[1]Administrative Law Judge Allen R. Link conducted the hearings in both Moseley's and Washington's unfair practice cases.

findings are not supported by substantial evidence." Rather, petitioner alleges the Board's conclusion is not supported by its findings.

Again, as we have previously stated, determinations made within the agency's area of expertise are to be accorded deference and accepted unless they can be found to be "clearly erroneous." If there is a plausible basis for the board's factual decisions, a reviewing court should not be concerned that contrary findings may seem equally reasonable. (*San Diego Adult Educators* v. *Public Employment Relations Bd.*, *supra*, 223 Cal.App.3d 1124, 1131, 1136.)

In the concluding paragraph of the "Discussion" portion of its decision, which might equally be entitled "Findings and Conclusions," the PERB states:

"Based on the inconsistent testimony and the FSPD's failure to meet the most minimum of standards in documenting Washington's performance throughout his probationary period, the Board finds CSU failed to present credible evidence of an operational justification for Washington's rejection from probation. Accordingly, the Board finds the charging parties proved, by a preponderance of the evidence, that Washington's rejection from probation was due to his protected activity."

In the instant case, there is no dispute that Washington engaged in protected activity, that employer was aware of such protected activity and that adverse action was taken against the employee, i.e., he was terminated. The Board further found, among other things, that:

1. The proximity of time between Washington's participation in protected activity and his rejection from probation supported an inference that there was a causal connection between these two circumstances.

2. Petitioner gave inconsistent or contradictory explanations for its evaluation of Washington, i.e., Washington received uniformly positive evaluations for the first nine months of his twelve-month probation period but petitioner insisted Washington was guilty of a series of egregious and inappropriate actions during the same period, none of which was either documented or discussed with him until the last month or six weeks of his probationary period.

3. Both sworn and nonsworn long-term employees of FSPD believed (and testified) that Washington was a good police officer and did nothing to warrant rejection.

4. The FSPD's inaccurate preparation of Washington's evaluation reports was a departure from established procedures, and the evaluations failed to properly represent the FSPD's honest opinion of Washington's progress toward completing his probationary period.

5. The investigation of Washington's capabilities and potential value to FSPD was inadequate.

6. The combination of the timing of Washington's rejection from probation, inconsistencies in the FSPD's actions, departure from established procedures, and inadequacies of the investigation of Washington's performance led to the conclusion that the charging parties presented a prima facie case of discrimination.

7. The Board concluded the parties were agreed that it would be improper for CSUF to rely upon Washington's employment history, known by CSUF prior to his employment, as a basis for his rejection during probation. The Board then further stated: "If the Board disregards these factors, then CSUF's reasons for Washington's rejection are even more unpersuasive."

Thus, it seems clear the Board's conclusion, previously quoted, is amply supported by its findings and reasonable inferences to be drawn therefrom. A retaliatory motive by petitioner was a plausible basis for the respondent Board's factual decisions in the instant case. Since petitioner does not (a) challenge the sufficiency of the evidence underlying the Board's determination or (b) show the Board's determination was "clearly erroneous," petitioner's contentions must be rejected.

*II. Did Respondent Erroneously Require Petitioner to Prove Washington's Misconduct as a Condition to His Rejection on Probation?*

The charging party has the burden of showing protected conduct was a motivating factor in the employer's decision. Once that is established, then the burden shifts to the employer to establish an affirmative defense. Typically, the employer must show that despite the antiunion motivation, the employment decision would have been taken anyway, for other, legitimate business reasons. The board, not the ALJ, is the ultimate factfinder, entitled to draw inferences from the available evidence. The statutorily mandated deference to findings of fact runs in favor of the board and not in favor of the initial trier of facts, the ALJ. Although entitled to some weight, the ALJ's factual findings, even demeanor-based credibility findings, are not conclusively binding on the board. A mixed-motive situation exists where legitimate business reasons arguably concur with antiunion motivations as the basis for an employment decision. The test of employer conduct

in such a situation is a "but for" test—whether the discharge or other violation of protected activity would have occurred regardless of the improper antiunion motivation. This is an affirmative defense which the employer must establish by a preponderance of the evidence, once the charging party has proved antiunion animus played any part in the decision. (*McPherson v. Public Employment Relations Bd.* (1987) 189 Cal.App.3d 293, 302-304 [234 Cal.Rptr. 428].)

In the instant case, the Board found the petitioner failed to present credible evidence of an operational justification for Washington's rejection from probation. The Board based this finding on numerous findings, some of which were previously recited in part I of this opinion (*ante*). Petitioner now contends the Board erred under state and federal law:

"It is well established that a probationary employee serves at the pleasure of the appointing authority, and that the probationary employment may be terminated, at any time during the probationary period, without legal good cause. *Board of Regents of State Colleges* v. *Roth* (1972) 408 U.S. 564, 92 S.Ct. 2701; *Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771 [97 Cal.Rptr. 657, 489 P.2d 537] cert. den. 405 U.S. 1030.)

"Nevertheless, a probationary employee may not be rejected for the exercise of a constitutional right (*Bogacki, supra*) or for engaging in an activity protected by labor statutes. ([C]f. *Healdsburg Police Officers Assn.* v. *City of Healdsburg* (1976) 57 Cal.App.3d 444, 129 Cal.Rptr. 216.)

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Initially, Petitioner University denies that it had any anti-union motivation, or any other unlawful motivation, when it rejected Washington during his probation. But, assuming for argument purposes that the Court finds an unlawful motivation, Petitioner University submits that, for 'legitimate business reasons,' Petitioner University would have rejected Washington from probation anyway. (In its decision, the Board used the term 'operational justification' rather than 'legitimate business reason.' Petitioner University believes that the terms are interchangeable to prove the 'but for' test.)

"The administrative record is filled with evidence of Washington's acts of misconduct. While these acts of misconduct may not constitute sufficient legal grounds for a dismissal for cause, they more than show Washington to be a police officer whom Petitioner University would reject during probation."

Appellate courts must accept PERB's factual findings, including ultimate facts, as conclusive if they are supported by substantial evidence on the record as a whole. Under the substantial evidence test, courts may not reweigh the evidence and may not consider that an alternative finding may be equally reasonable, or even more reasonable, than the finding made by PERB. (*Inglewood Teachers Assn.* v. *Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 781 [278 Cal.Rptr. 228].) When a labor board chooses between two conflicting views, a reviewing court may not substitute its judgment for that of the Board. (*Regents of University of California* v. *Public Employment Relations Bd., supra,* 41 Cal.3d 601, 617-618.)

Real parties argue in opposition to the petition for writ:

". . . Petitioner refers to various portions of the Administrative Record allegedly establishing misconduct by Mr. Washington evidencing a sufficient operational justification for Washington's termination from employment.

"However, PERB found that these alleged acts of misconduct were inconsistent with the formal performance evaluations which were provided [to] Mr. Washington by his various training officers. These inconsistencies certainly affect the credibility and weight of the testimony. Obviously PERB weighed the evidence [and] found that these inconsistencies could not support a finding of operational justification but did support a[n] inference of unlawful motivation."

Real parties' position is well taken. Petitioner is essentially asking this court to choose between two conflicting views of the evidence. Although petitioner's position is supported by the testimony of various FSPD officers, that testimony is disputed and/or contradicted by Washington's formal performance evaluations as well as the testimony of other sworn and unsworn employees and by Washington, himself. As noted above, the Board is the ultimate factfinder and is entitled to draw inferences from the available evidence. Here, the Board clearly accepted Washington's version of the events and rejected or dismissed the testimony underlying petitioner's affirmative defense of "legitimate business reasons." The relationship of this court to an agency such as PERB is one of deference and the PERB's determination should be followed unless it is clearly erroneous. In light of the entire administrative record, we cannot say the Board's determination was "clearly erroneous." Thus, petitioner's prayer for writ relief must be denied.

Petitioner's petition for writ of prohibition and/or mandate is denied.

Ardaiz, J., and Dibiaso, J., concurred.