Filed 9/29/20  Estate of Clark CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Estate of DAMON CLARK, Deceased. | |
| ELIZABETH SCHNEIDER CLARK,  Petitioner and Appellant,  v.  SUSAN RADELT,  Objector and Respondent. | A159182  (Alameda County Super. Ct. No. RP17881782) |

Damon Clark (Damon)[1] died an untimely death in September 2017 at the age of 39.  He left a will in which he bequeathed his three rental properties to his wife, appellant Elizabeth Schneider Clark (Elizabeth) and granted his mother, respondent Susan Radelt (Susan) "a life estate of either (1) residency rent-free in the smallest of my real properties, or (2) the rental income of the property of up to the sum of two thousand dollars ($2,000.00)."  The trial court issued an order

---

[1] We use the parties' first names not from disrespect, but to ease the reader's task.

requiring the disputed language to be interpreted as "anything any other tenant of the apartment would be expected to pay as rent to the landlord," with a cap of $2,000 per month.

The parties agree the will gives Susan the right to live rent-free in the smallest unit Damon owned at the time of his death, located on the Sonoma Highway in Sonoma. But they disagree about whether the term "rental income" if she elects to live elsewhere refers to the gross or the net amount of the rent, whether the $2,000 cap should apply on an annual or monthly basis, and whether Susan is entitled to the fair market rental value of the property even when it is not in fact rented out. We agree with Elizabeth that "rental income" is limited to actual income but affirm the court's order requiring her to pay gross rents, with a cap of $2,000 per month.

## I. BACKGROUND

Damon struggled with drug addiction over the course of his life. He spent some of his teens and early twenties in the custody of juvenile hall and then prison. Despite this, he was able to stay clean and sober for stretches of time. He married his first wife, Kelly Clark (Kelly), obtained his general contractor's license, and acquired several rental properties. This included a complex of four units on Sonoma Highway, the smallest of which had rented for $1200 per month.

In late 2014, Damon and Kelly separated, and he became romantically involved with Elizabeth, who was his high school sweetheart and longtime friend. They began trying to have a baby together and planned on getting married. Because Damon

2

was still married to Kelly, he was concerned that if he died without a will, his property would pass intestate to her instead of to Elizabeth and their unborn child. Using a template pulled from the Internet, he drafted a will.

Damon sometimes had a difficult relationship with his mother, Susan. He believed her to be financially irresponsible and was concerned about her inability to handle money. Ultimately, Damon decided to include a gift for Susan in his will to ensure that she had housing. He wanted to give her the chance to live rent-free in the smallest of the apartments he owned,[2] but recognized she might decide to live somewhere else. He devised a gift where she could elect to either live in one of his apartments or take the income from that apartment to secure housing elsewhere.

In September 2015, Damon signed a final version of the will that left most of his property to Elizabeth, made her the executor, and included monetary gifts to his niece and sister. It also included paragraph 1.b., which provided, "To Susan Radelt of Fairfax, California, I give a life estate of either (1) residency rent-free in the smallest of my real properties, or (2) the rental income of that property of up to the sum of two thousand dollars ($2,000.00)."

In 2016, Damon had an email exchange with Susan in which he expressed frustration with her inability to manage

---

[2] Damon and Kelly owned several properties together. Because their divorce was not yet final when he drafted his will, he did not yet know which properties would be awarded to him and which would be the smallest property he owned.

3

money. He offered to supplement her monthly income by $300, subject to certain conditions that included making him the trustee of her social security and retirement income payments, signing up for senior housing lists and public assistance, and not asking him for more money. Damon did not end up providing the $300 per month.

Damon and Elizabeth married, and their daughter was born in early 2017. Damon died in September 2017 from an overdose of opiates.

A dispute arose between Elizabeth and Susan over the distribution of Damon's estate. Elizabeth, as executor of the estate, filed a "Petition for Determination of Entitlement to Estate Distribution." The petition alleged, "[Elizabeth] contends Damon intended to give [Susan] the right to live in the smallest unit of one of his properties without any obligation on her part to pay any of the expenses of the property. Alternatively, if [Susan] chose not to live in such unit, Damon intended that she receive the net monthly income from that unit, up to a maximum [of] $2,000 per month. [Elizabeth] therefore seeks an order confirming this as [Damon's] intention and determining how [Damon's] estate will be distributed under Article THREE, Paragraph 1.b of [Damon's] will."

The trial court held a hearing and heard extrinsic evidence regarding Damon's intent when drafting his will, consisting of testimony by both parties, Damon's sister, his first wife, Kelly, and his treating psychotherapist, as well as the deposition testimony of his friend and Alcoholics Anonymous (AA) sponsor

4

and email exchanges between Damon and Susan in 2016, after his will had been signed. In her trial brief for the hearing, Elizabeth argued that Damon's gift to Susan should be construed to allow her to live in the smallest of his properties rent free or to be given the net rental income from that apartment, to be capped at $2,000 per *year*. Her theory at trial was that Damon had not believed Susan could be trusted with money, and so he would not have wanted to provided her with a monthly sum that might be spent on things other than rent. Elizabeth argued that by providing an alternative of receiving only the rent after expenses had been taken out, and with an annual cap of $2,000, Damon was encouraging Susan to opt for the alternative of living at the Sonoma Highway property and to thereby accept secure housing.

The trial court issued a statement of decision in which it concluded that "based on the plain meaning of the will, the term 'rent-free' means that if [Susan] chooses to live in the apartment, she would not have to pay any rent. The term 'rent' means anything any other tenant of the apartment would be expected to pay as rent to the landlord, petitioner Elizabeth Clark." It further concluded that "the term 'rental income' means that if [Susan] chooses to live somewhere else, she would receive from petitioner an amount equal to the rent any other tenant would pay for the apartment" "up to [a limit of] $2,000.00 per month." The court noted that rent on the apartment at issue had been as much as $1200 per month, and that if "Damon intended to force [Susan] to stay in the apartment by limiting her 'rental income' to $2,000 per year, he would not have any reason to give [Susan]

5

even the choice of receiving any 'rental income.'" It ordered that "[Susan] has the legal right to choose between residing in the apartment . . . without paying any rent that any other tenant of the apartment would pay as rent to [Elizabeth], or receiving the 'rental value' of [the apartment] that any other tenant for the apartment would pay for rent, up to a limit of $2,000.00 per month."

Elizabeth appealed from this order, arguing that the will should be interpreted to require payment of only the net amount of actual rent collected each month, up to an annual limit of $2,000.00.[3]

## II. DISCUSSION

A. *Standard of Review*

"[I]n the construction of wills, the cardinal rule to be observed is to ascertain the intent of the testator, and if that intent can be clearly conceived, and is not contrary to some positive rule of law, it must prevail." (*In re Estate of Major* (1928) 89 Cal.App. 238, 241.) In reviewing a trial court's construction of a will, "we are free to independently interpret the instrument as a matter of law *unless* the trial court's interpretation turned upon the credibility of extrinsic evidence or required resolution of a conflict in the evidence." (*Estate of Verdisson* (1992) 4

---

[3] Susan has not filed a respondent's brief. We do not consider this to be a concession but reach the merits of Elizabeth's appeal. (*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1078, fn. 1.) We will examine the record on appeal based on Elizabeth's opening brief and will review the order appealed from for prejudicial error. (Cal. Rules of Court, rule 8.220(a)(2).)

Cal.App.4th 1127, 1135; *Estate of Goyette* (2004) 123 Cal.App.4th 67, 70.)

Where a written instrument is ambiguous and the court receives conflicting extrinsic evidence as an aid in resolving the ambiguity, we apply the substantial evidence rule to any factual findings made by the trial court. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318–319.) In such a case, "any reasonable construction will be upheld if it is supported by substantial evidence." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956; *Roden v. Bergen Brunswig Corp.* (2003) 107 Cal.App.4th 620, 625.) In conducting a substantial evidence review, we resolve any conflicts and draw all legitimate and reasonable inferences in favor of the judgment. (*Estate of Bristol* (1943) 23 Cal.2d 221, 223.)

The phrase "rental income of the property of up to the sum of two thousand dollars ($2,000.00)" is ambiguous as it does not state (1) whether the income is gross or net income; and (2) whether the $2,000 cap should be applied on a monthly, annual or one-time basis. Elizabeth implicitly agrees, by acknowledging that the trial court's findings of fact must be reviewed for substantial evidence.

B. *Net vs. Gross Amount of Rent*

The trial court found that in the event Susan opted not to live in the Sonoma Highway apartment and to instead take the "rental income" of the property, the amount of rental income would be calculated without deducting expenses such as taxes, maintenance, and property management fees. Elizabeth argues

7

there is no evidence to support a finding that Damon "intended to impose, or that the Will's terms did impose, upon [Elizabeth], and by extension his daughter, the affirmative obligation throughout [Susan's] life to bear the costs, tenant turnover expenses, income taxes and upkeep charges all resulting from [Susan's] own election to choose the 'rental income' from the apartment instead of rent-free shelter."

This overlooks that in the event Susan took the option of living in the Sonoma Highway apartment rent free, Elizabeth also would be required to bear the expenses associated with that apartment without receiving rent. Although there may be some additional expenses associated with tenant turnover, she is not placed in a significantly worse situation because someone other than Susan pays rent for the property and then she must pay that amount to Susan. One can infer from the evidence that Damon intended to provide for Elizabeth and his daughter by the fact that he left the lion's share of his property to Elizabeth. But the gift to Susan, should she decide to live in the Sonoma Highway apartment, would require Elizabeth to pay the cost of maintaining it even as she did not receive any rent for it. It is reasonable to conclude that Damon intended to burden Elizabeth to the same amount if she made a different decision.

The evidence shows that Damon had a conflicted relationship with Susan at times, but it also supports an inference that he wished to ensure she would have stable housing in the event he died before she did. Although there was evidence that when Damon was alive he intended to limit his assistance to

8

Susan to $300 per month, this is not inconsistent with an intent to ensure that after his death, when he would have no opportunity to revisit his assistance to Susan, he would leave her enough to make sure she would have a place to live. We note that Damon apparently did not offer Susan the opportunity to live rent free in the Sonoma Highway apartment while he was alive, but this does not negate his intent to do so upon his death.

In his deposition, which was offered into evidence, Terrance Lundy, Damon's AA sponsor and friend, testified that although Susan was a source of anxiety for Damon, he wished to ensure that she had a place where she could live. Susan testified that Damon said several times that he wanted to take care of her. Damon's first wife, Kelly, testified that Damon wanted Susan to have a safe place to live. The trial court could reasonably conclude that in the event that Susan did not opt for living at the Sonoma Highway apartment, this goal could best be met by giving Susan the gross amount of the rent for that apartment, which she could then take and apply to her rent somewhere else.

Moreover, the Sonoma Highway apartment is part of a complex in which there were a total of four units. As such, it would presumably share some expenses with the other units. This means the calculation of the net income for the apartment would have to be apportioned based on the number of units in the complex, the square footage of the unit at issue or some other formula. It was reasonable for the trial court to conclude that had Damon meant for the "rental income" to mean net rental

9

income, he would have specified how the net rental income should be calculated.

Elizabeth points out that other statutes define "income" to mean "net income," citing Civil Code section 731.05 [allocation of principal and income between tenants and remaindermen], Probate Code section 16356 [rents received on property allocated to income], Probate Code section 16326 ["income interest" means right of a trust beneficiary to receive net income], Probate Code section 16370 [expenses to be disbursed out of trust income] and Probate Code section 16371 [disbursements to be made from principal of trust]. There was no evidence to show that Damon, a layperson who drafted his own will, attached any technical meaning to the term "rental income" based on these statutes. In ascertaining Damon's intent, we look to the purpose of the gift, which in this case was to provide Susan with housing.

Elizabeth also notes that the owner of real property usually does not have the duty to maintain it for the benefit of a life tenant, citing Civil Code section 840 [life tenant must keep buildings and fences in ordinary repair]. We are not persuaded. This section has no application where it runs contrary to the testator's intent. (See *Almeida v. Price* (1951) 107 Cal.App.2d 148, 154 [Civ. Code § 840 does not apply when life tenant was mother of remaindermen and order requiring remaindermen to pay taxes, insurance and improvements was "eminently fair and just"].)

" 'A life estate is an estate whose duration is limited to the life of the person holding it or of some other person.' " (*Peterson*

*v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 844, 850–851.) "[A]ll life estates are not created equal. Some are referred to as 'absolute' meaning that the owner thereof can do almost anything with his interest other than commit waste." (*Forrest v. Elam* (1979) 88 Cal.App.3d 164, 170 (*Forrest*); Civ. Code, § 818 ["The owner of a life estate may use the land in the same manner as the owner of a fee simple, except that he must do no act to the injury of the inheritance."].) "Others are known as determinable or contingent because of various sorts of limitations placed upon the life estate." (*Forrest*, at p. 170.)

In this case, Susan had the right to live in the Sonoma Highway apartment rent free for the rest of her life, or to receive the rental income from that apartment. Her interest was not the equivalent of a fee simple, and she did not have an absolute life estate that entitled her to dispose of the apartment, either by renting or selling it. It was part of a piece of property gifted to Elizabeth in fee simple, and Susan's control over it was limited to living there or collecting the income. In light of this, Civil Code section 840 did not apply.

In support of her argument that "rental income" as used in the will means net income, Elizabeth cites the evidence that she and her daughter were Damon's priority, that Damon wanted to encourage Susan to live at the Sonoma Highway apartment, and that Damon told her he could give Susan "what's left of the rent" in the event she decided not to live there. This was evidence that the trial court could have relied upon to reach a contrary result. But it does not render the evidence insufficient to show that the

11

reference to "rental income" was to be calculated without regard to expenses. Because the extrinsic evidence was in conflict, we may not second guess the trial court, so long as its decision was supported by substantial evidence.

C. *$2,000 Cap on Rental Income*

Elizabeth challenges the trial court's finding that the $2,000 cap was appliable to monthly, not yearly, rent. We note that in her petition, she assumed the cap applied each month; it was only at trial that she changed her position and advocated for a yearly cap. We reject the claim.

Accepting that Damon's intent in making the gift to Susan was to insure that she have stable housing, this purpose is not served by capping the amount which she is entitled to receive at $2,000 each year, an amount equivalent to less than two months' worth of rent for the apartment. Although Elizabeth argues that a $2,000 annual cap is consistent with Damon's desire that Susan opt to live in the Sonoma Highway apartment, as the trial court noted, "if [Damon] intended to force [Susan] to stay in the apartment by limiting her 'rental income' to $2,000 per year, he would not have any reason to give [Susan] even the choice of receiving any 'rental income.' " We also note that residential rent is generally paid on a monthly, not annual basis; it makes sense that if nothing is said to the contrary, a cap on residential rental amounts would be on a monthly basis as well. (See Civ. Code, § 1944 ["In the absence of any agreement respecting the length of time or the rent, the hiring is presumed to be monthly."].)

12

Resolution of an ambiguity based on the admission of extrinsic evidence is for the trier of fact and must be upheld if supported by substantial evidence. (*Baker v. Ramirez* (1987) 190 Cal.App.3d 1123, 1132–1133.) Substantial evidence supports the trial court's conclusion that $2,000 was a monthly, not an annual, cap.

D. *Defining "Rental Income" as the Fair Market Rental Value of the Apartment*

Elizabeth finally contends the trial court erred in defining "rental income" to mean "an amount equal to the rent any other tenant would pay for the apartment" and in requiring her to pay Susan the "rental value" of the apartment, rather than the rent actually received. She argues that the plain language of the will refers to income actually received rather than the rental value and asserts there is no evidence that Damon intended for her to pay Susan the rental value of the apartment if it was not in fact rented out (or was rented for less than fair market value). With this contention, we agree.

The trial court's disposition has the benefit of providing Susan with an uninterrupted stream of income with which she can secure alternative rental housing, and of avoiding future disputes between Elizabeth and Susan arising from a failure to rent the apartment. We understand the trial court's impulse. But the plain language of the will refers to "rental income" not "rental value". Because the language is clear and explicit in this regard and cannot reasonably be construed to mean fair market rental value rather than actual rent, the plain meaning governs

13

and it is unnecessary to resort to extrinsic evidence. (See *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949.) In any event, nothing in the testimony presented supports the conclusion that Damon intended Elizabeth to pay the apartment's rental value to Susan regardless of whether or not it was actually rented.

We also note that Susan did not argue at trial or in her response to Elizabeth's petition that she should receive the fair market rental value of the apartment, instead claiming that she was entitled to be paid the rent received, without regard for expenses. The issue of fair market rental value was therefore beyond the issues litigated and should not have been included in the judgment. (*C.J.A. Corp. v. Trans-Action Financial Corp.* (2001) 86 Cal.App.4th 664, 673.)

## III. DISPOSITION

The trial court shall modify its statement of decision and the judgment consistent with this opinion. The judgment is otherwise affirmed. The parties shall bear their own costs in the interests of justice.

14

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BURNS, J.

*Clark v. Radelt* / A159182