Filed 2/11/15  P. v. Rivers CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B253757 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA403312) |
| v. | |
| REGINALD SABA RIVERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed with modifications.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Reginald Rivers appeals from a judgment of conviction for second degree murder. We modify the abstract of judgment to correct the court facilities assessment, and so modified, we affirm.

## FACTS

### 1. Ralph Alegria

On October 1, 2012, Ralph Alegria, Gary Honkanen, and appellant were staying at a homeless encampment near the 101 freeway in Echo Park. They started drinking beer together at approximately 6:00 a.m. Alegria knew appellant from a different encampment, where he had met appellant more than 10 times. Jose Felix joined them at approximately 8:00 a.m. or 9:00 a.m. Everyone except Felix took turns going to the store and buying beer for the group. Felix was drinking the beer others bought but did not buy any for the group. They drank beer for several hours and also smoked marijuana. Appellant shared his marijuana with the group. When he ran out and asked Felix to share his, Felix refused.

While they were drinking, Felix and appellant were exchanging "bad words" off and on. Alegria described appellant as "on the hot-tempered side." At some point, Felix and appellant began arguing in earnest. Alegria thought Felix called appellant, who is African-American, the "N" word. Appellant "got real mad" when Felix called him that and "jumped on top of him and beat the heck out of him." Felix was lying on his back as appellant sat on him and hit him with closed fists in the face. Appellant hit Felix approximately 30 times. At some point, appellant just stopped and ran out of the encampment. Felix's face was very bloody and he seemed to be breathing lightly, and then he appeared to stop breathing. It was approximately 2:00 p.m. when appellant ran away, and they had been drinking continuously since 6:00 a.m.

### 2. Emmanuel Rosales

At approximately 11:00 a.m. or 12:00 p.m. on October 1, 2012, Emmanuel Rosales and two friends were walking on a pedestrian walkway under the 101 freeway

2

near the homeless encampment. Rosales saw three people sitting in the area of the encampment—Felix, an African-American man, and a woman.[1] Approximately an hour later, Rosales walked by the same location, and Felix was standing and screaming at the African-American man as if he was angry. Felix was slurring his words and seemed like he had been drinking alcohol. The African-American man was sitting down approximately six feet from Felix and seemed calm. Rosales and his friends went to a liquor store and walked by again approximately 10 to 15 minutes later. Felix was laying on the ground, and the African-American man was standing over Felix and "throwing" a log at his face. He hit Felix in the face with the log four or five times. He was saying, "Stop talking your shit." Rosales called 911 on his cell phone.

Rosales had seen Felix several times before in the neighborhood. He was intoxicated and loud on these prior occasions, and he was arguing with others on one prior occasion.

### 3. Investigation

At approximately 12:30 p.m. or 12:45 p.m. on October 1, 2012, Officer Frank Carrillo received a radio call regarding an assault with a deadly weapon in progress and responded to the homeless encampment. When he and his partner arrived, paramedics had already pronounced Felix dead. A log that weighed approximately 20 to 30 pounds was resting against Felix's head.

A medical examiner for Los Angeles County observed injuries to Felix's head and shoulder area but nowhere else. He had seven separate lacerations or wounds to the face and head, and fractures to the nose, cheek bone, and upper and lower jaw. The medical examiner determined the cause of death was blunt force head trauma. Felix had a blood alcohol level of 0.14 percent. (The legal limit for driving is 0.08 percent. [Veh. Code, § 13353.2, subd. (a)(1).]) He also tested positive for marijuana.

---

[1] Honkanen's hair was several inches below his shoulders. The prosecutor argued to the jury that Rosales mistook him for a woman.

Detective Jeff Cortina interviewed appellant at the police station on October 4, 2012. Appellant did not have any noticeable injuries to his face, hands, or arms. He appeared to have blood on his pants and on some socks he was carrying around with him. Stains on the log next to Felix, appellant's socks, and appellant's jeans tested presumptively positive for blood. DNA testing on all these stains revealed a match with Felix's DNA profile.

## PROCEDURE

A jury acquitted appellant of first degree murder and convicted him of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.)[2] The jury found true that appellant had personally used a deadly weapon, to wit, a log. (§ 12022, subd. (b)(1).) Appellant admitted a prior strike (§§ 667, subds. (b)-(i), 1170.12) and prior serious felony conviction (§ 667, subd. (a)(1)). The court sentenced him to a total of 36 years to life in state prison, consisting of 15 years to life for the murder conviction, which was doubled pursuant to the "Three Strikes" law, five years for the prior serious felony conviction, and one year for personally using a deadly weapon. Appellant timely appealed.

## DISCUSSION

### 1. Substantial Evidence Supported Appellant's Conviction for Second Degree Murder as Opposed to Voluntary Manslaughter

Appellant contends we must reduce his conviction to voluntary manslaughter because the prosecution did not prove a lack of heat of passion caused by adequate provocation. We disagree.

Murder "is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice aforethought" may be express or implied. (§ 188.) Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (*Ibid.*) It is implied "when the circumstances attending the

---

[2]    Further undesignated statutory references are to the Penal Code, unless otherwise noted.

4

killing show an abandoned and malignant heart." (*Ibid*.) Implied malice murder does not require a showing that the defendant intended his or her acts to result in the death of a human being. (*People v. Swain* (1996) 12 Cal.4th 593, 602.) It occurs "'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.) A murder that does not involve the additional elements necessary to support first degree murder—willfulness, premeditation, and deliberation—is second degree murder. (§ 189; *People v. Knoller* (2007) 41 Cal.4th 139, 151.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) Murder may be reduced to voluntary manslaughter when malice is presumptively absent because the defendant killed "upon a sudden quarrel or heat of passion." (§ 192, subd. (a); see *People v. Lee* (1999) 20 Cal.4th 47, 59.) "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." (*People v. Lee, supra*, at p. 59.) The test for adequate provocation is objective. (*Id.* at p. 60.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 59.) "'[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

When the evidence suggests provocation may be an issue, the prosecution has the burden of proving provocation was lacking to establish the malice element of murder. (*People v. Rios* (2000) 23 Cal.4th 450, 462; CALJIC No. 8.50; CALCRIM No. 570.) If the finder of fact determines the killing was intentional and unlawful but is not persuaded beyond a reasonable doubt that provocation was absent, it should acquit the defendant of murder and convict him or her of voluntary manslaughter. (*People v. Rios, supra*, 23

5

Cal.4th at p. 462.) If the evidence of provocation is not sufficient to reduce murder to manslaughter, the jury should consider it for the bearing it might have on whether the defendant killed with premeditation and deliberation. (*People v. Valentine* (1946) 28 Cal.2d 121, 132; CALJIC No. 8.73; CALCRIM No. 522.)

When the defendant challenges the sufficiency of the evidence, we review the record in the light most favorable to the judgment for substantial evidence supporting the judgment. (*People v. Booker* (2011) 51 Cal.4th 141, 172.) ""We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."" (*Ibid.*)

Here, the court instructed the jury on the above principles regarding murder and manslaughter, including that it should convict appellant of manslaughter rather than murder *if* the prosecution failed to prove a lack of provocation beyond a reasonable doubt. The jury chose to find appellant guilty of second degree murder, rather than manslaughter. Substantial evidence supported the jury's verdict. The evidence demonstrated appellant stood over Felix, punched him, and threw a 20 to 30 pound log at his head numerous times, causing blunt force trauma so severe that it killed Felix. This deliberate conduct demonstrated a conscious disregard for Felix's life, and indeed, appellant does not argue otherwise.

Instead, appellant contends there was provocation because Felix called appellant an inflammatory racial slur. He suggests these circumstances were sufficient as a matter of law to constitute the provocation required for voluntary manslaughter, arguing "the record provides no basis for the jury to have rejected the possibility . . . that appellant killed in a heat of passion caused by sufficient provocation." We cannot agree. It was a question of fact for the jury whether the circumstances were sufficient to cause an average, sober person to "be so inflamed that he or she would lose reason and judgment." (*People v. Lee, supra*, 20 Cal.4th at p. 60; see *People v. Millbrook* (2014) 222

6

Cal.App.4th 1122, 1140.) The jury could have reasonably concluded that an ordinary person of average disposition would not have lost reason and judgment in these circumstances, even if appellant, who was known as "hot tempered," did. (*People v. Reilly* (1970) 3 Cal.3d 421, 425 [test is whether a reasonable trier of fact could have found the prosecution carried its burden].) Courts have often determined that insulting or taunting words alone were insufficient to constitute provocation for purposes of voluntary manslaughter. (E.g., *People v. Enraca* (2012) 53 Cal.4th 735, 743, 759 [victim's "'talking all sorts of shit'" to rival gang members insufficient provocation]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586 [calling the defendant a "'mother fucker'" and taunting him to use a weapon were "plainly . . . insufficient" to constitute provocation]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [using a gay slur was insufficient evidence of provocation]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739-740 [calling the defendant names, giving him dirty looks, and smirking at him was insufficient evidence of provocation]; see 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 236(3), p. 1059 ["The use of words commonly employed to taunt another, however grievous, does not ordinarily drive a reasonable person to such passion as would reduce an unlawful killing to manslaughter."].)

The jury does not appear to have completely overlooked the evidence of provocation, as appellant suggests. The court instructed the jurors that if the evidence of provocation was insufficient to reduce murder to manslaughter, they could consider it for the bearing it may have on whether appellant killed with premeditation and deliberation. (*People v. Valentine, supra*, 28 Cal.2d at p. 132; CALJIC No. 8.73; CALCRIM No. 522.) The jurors chose to acquit appellant of first degree murder.

We are not suggesting that verbal provocation is never adequate to reduce murder to voluntary manslaughter. Our Supreme Court has stated that verbal provocation may be sufficient, as appellant points out. But the issue is still one of fact for the jury, and the jury here determined—not unreasonably—that provocation was lacking. The cases appellant cites for the proposition that verbal provocation may be sufficient do not assist him. (*People v. Moye* (2009) 47 Cal.4th 537, 550; *People v. Lee, supra*, 20 Cal.4th at

7

p. 59; *People v. Berry* (1976) 18 Cal.3d 509, 515.) While these cases state the principle, all of them involved circumstances beyond verbal provocation, and none of them held words alone were sufficient provocation. (*People v. Moye, supra*, at pp. 551-554 [kicking the defendant's car was not provocation sufficient to warrant heat-of-passion voluntary manslaughter instruction; victim's fight with the defendant the night before the killing also did not warrant the instruction because the defendant had "cooled off" by the next day; attacking the defendant with a bat was not legally sufficient provocation but warranted self-defense instructions]; *People v. Lee, supra*, at pp. 59-60 [though the defendant and his wife quarreled and pushed each other for several minutes before he shot her, the appellate court was not required to decide whether the evidence of provocation was sufficient, because any instructional error was favorable to the defendant]; *People v. Berry, supra*, at pp. 513-516 [wife's affair and two-week period in which she "taunted" the defendant with her involvement with the other man, while "at the same time sexually excit[ing] defendant," constituted sufficient evidence of provocation to warrant voluntary manslaughter instruction].)

## 2. *The Prosecution Did Not Commit Misconduct Requiring Reversal*

Appellant contends the prosecutor committed prejudicial misconduct when she misstated the law to the jury. We disagree.

### a. **Prosecutor's Statements to Which Appellant Objects**

During closing argument, the prosecutor argued as follows:

"Well, it is important that we not confuse motive with legally sufficient provocation. Motive can inform your decision about why somebody did something. It's not an element of the crime. You didn't see any element that said motive. Why? But if something happens that makes someone mad, makes their blood boil, makes them angry enough to kill, that is not always a manslaughter. It's not automatically a manslaughter. It has to be something that an ordinary and reasonable person in that situation would feel so inflamed by that they could not act rashly [*sic*]. They could not act reasonably and objectively in that situation.

"So the defendant's actions were aggressive. He did something that nobody would approve of. He did something that sadly, we often see people on the street doing. Some of us have even had interactions with

8

homeless people where they're aggressive, loud, make you feel bad and uncomfortable, maybe even make you feel afraid. But does that mean that what Mr. Rivers did is nevertheless reduced to a manslaughter? No.

> "*It means you have to think about would an objectively reasonable person in that same situation pick up this log, of all the things he had available, and smash Mr. Felix's face flat?*" (Italics added.)

Defense counsel interposed an objection here that this was a misstatement of the law. (On appeal, appellant also argues the above italicized language misstated the law.) The court overruled the objection and stated it would "allow the argument," then said: "Actually, the use of the 'objective'—it's not an objective, reasonable person. That part is stricken." The prosecutor went on: "Thank you, Your Honor, for correcting me. That's not correct. It's an ordinary reasonable person."

Appellant also objects to a portion of the prosecutor's rebuttal argument, in which she stated:

> "Mr. Rivers, the law tells you, is not allowed to say to you: 'This made me so mad it doesn't matter what an ordinary reasonable person would do.' You have to take Mr. Rivers and put him to the side and put Joe Ordinary, Joe Reasonable in that embankment and say: '*Would that person, after listening to Mr. Felix be a drunk jerk for an hour or so, be so overcome that he smashed his face as flat as a pancake?*' And the answer is 'no.'"

Again, appellant contends the above italicized language misstated the law. He argues the prosecutor essentially told the jury that Felix's provocation "had to be sufficient to cause an ordinary reasonable person to react by using a log to smash [Felix's] face," and "[t]hat is not the law."

**b. Forfeiture**

As a threshold matter, respondent contends appellant has forfeited this argument because defense counsel's objection to the first statement was not sufficiently specific, and counsel did not object to the second statement at all. We decline to find a forfeiture.

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the

9

impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) An exception exists when a timely objection or request for admonition would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Further, the failure to request an admonition does not forfeit the issue if the court immediately overrules the objection and the defendant thus has no opportunity to make the request. (*Ibid.*)

Here, defense counsel objected to the first statement on the ground that it misstated the law, which is also the basis for the claim of prosecutorial misconduct on appeal. The court immediately overruled the objection, giving no chance for counsel to request a curative admonition, and then sustained it only to the extent the prosecutor said "objectively reasonable person" as opposed to "ordinary reasonable person." Although defense counsel did not use the specific words "prosecutorial misconduct" in her objection, the basis for the objection implied such and was sufficient to preserve the claim for review. Regarding the statement in the prosecutor's rebuttal argument to which appellant did not object, another objection would have been futile. The statement was very, very similar to the first statement at issue, and the only error the court found in the first statement was not present in the second statement. If the court did not find the first statement to be a misstatement of the law beyond the minor correction it made, it seems unlikely it would have sustained an objection to the second statement on that ground.

### c. Misconduct Analysis

"A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.) "Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.) A prosecutor's misstatement

10

of the law before the jury may be misconduct, even if the misstatement was unintentional. (*People v. Hill, supra*, 17 Cal.4th at pp. 822-823, 829.)

Here, when the prosecutor argued the jury should consider whether an ordinary reasonable person in this situation would have "smashed" Felix's face with a log, she misstated the law. As we have discussed, an unlawful killing is voluntary manslaughter "if the killer's reason was obscured by a '"provocation"' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. [Citation.] The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*People v. Najera, supra*, 138 Cal.App.4th 212, 223.) "Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his [or her] reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

Still, we do not find that the two remarks by the prosecutor made the trial fundamentally unfair such that due process was denied, nor do we find a reasonable likelihood the jury applied the complained-of remarks in an objectionable fashion. First, despite these two remarks, the prosecutor correctly stated the rule for provocation numerous times—at least seven—during her closing or rebuttal arguments. As just some examples, she said: "It must be heat of passion that an ordinary, reasonable, everyday person would have in the same situation such that that heat of passion makes them act rashly with no judgment"; "[D]oes that mean . . . that an ordinary and reasonable person would have been so overcome that their judgment would have been impeded . . . ?"; "Or is an ordinarily reasonable person going to be so inflamed that their judgment will be overcome by rash emotion?"; "[A]n ordinary, reasonable person walking into that situation would be came [*sic*] inflamed and enraged and unable to act with proper

11

judgment and control?" The prosecutor also read the jury instruction explaining provocation to the jury (CALJIC No. 8.42), which correctly states the law.**3**

Second, in defense counsel's closing argument, she reiterated the instruction on provocation and argued a correct version of the standard: "I'm not asking you to say that it was reasonable for him to kill [Felix]. It wasn't. But that is not the standard. The only question here is: were his passions so aroused that that can explain why he reacted? [¶] . . . [¶] [T]he reasonableness of [appellant's] response is totally irrelevant. The fact that he grabbed a log that's that big and that heavy (indicating), that is irrelevant when you're considering whether heat of passion or sudden quarrel applies. [¶] The only thing that is relevant is would a reasonable person have reacted from passion, from those emotions?"

Third, the trial court properly instructed the jury on provocation with CALJIC No. 8.42, and it further instructed that if counsels' comments in their arguments conflicted with the court's instructions, then the jury was to follow the court's instructions. "[A]rguments of counsel 'generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.'" (*People v. Mendoza* (2007) 42 Cal.4th 686, 703.) We presume the jury understood and followed the court's instructions. (*People v. Morales* (2001) 25 Cal.4th 34, 47.) In light of the repeated emphasis of the correct standard and the court's proper instructions, the trial was not fundamentally unfair, nor was it reasonably likely the jury construed the complained-of remarks in an objectionable way.

---

**3** CALJIC No. 8.42 states in pertinent part: "The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment."

### 3. *The Prosecution Exercised Due Diligence in Attempting to Locate Alegria*

The trial court permitted the preliminary hearing testimony of Alegria to be read to the jury after it determined he was unavailable. (Our above summary of Alegria's statements is thus a summary of his preliminary hearing testimony as read to the jury.) Appellant contends the trial court erred when it ruled the prosecution exercised due diligence in attempting to locate Alegria. We disagree.

### a. Evidence Adduced at Due Diligence Hearings

Detective Julian Pere of the Los Angeles Police Department (LAPD) personally served Alegria in March 2013 with a subpoena for the preliminary hearing. He located Alegria at the homeless encampment where Felix's killing took place. Several weeks before trial in October 2013, the prosecutor asked Detective Pere to locate Alegria again, but the detective could not. His efforts included the following.

Detective Pere returned to the scene of the crime approximately three times. It appeared to have been cleaned out and was no longer a homeless encampment. He visited the site between 6:00 a.m. and 7:30 a.m., midday, and at approximately 4:00 p.m. Other officers made six separate visits to the site to look for Alegria. Detective Pere searched the LexisNexis system for past residences, phone numbers, and relatives. Based on that search, he went to five locations in Los Angeles that were previously associated with Alegria. He spoke to a woman at one location who said Alegria had rented a room there four years ago, but she did not provide a forwarding address. He found some telephone numbers that potentially belonged to Alegria, but they were no longer in service when he tried them. The prosecutor provided him with a telephone number for Alegria and another for Alegria's friend that purportedly belonged to them at the time of the preliminary hearing. One number was not in service. The other rang but no one would ever answer, and there was no way to leave a message at that number. He tried calling this number approximately 10 times and at different times of day.

The detective also checked the records of the LAPD; the California Department of Motor Vehicles; the telephone information line; the Prosecutors Information Management System available through the LAPD; the Los Angeles County Probation

13

Department; the Los Angeles County Sheriff's Department; the California Department of Corrections and Rehabilitation; the Federal Bureau of Prisons inmate locator; LAC+USC Medical Center, Martin Luther King, Jr. Community Hospital, and Harbor-UCLA Medical Center (though the hospitals would not provide information due to confidentiality rules); the Los Angeles civil court system through LexisNexis; the Los Angeles County Coroner's Office; the California Employment Development Department; the Los Angeles County Assessor's Office; the Los Angeles County Clerk for a search of fictitious businesses and voter registrations; the Housing Authority of the City of Los Angeles; the Union Rescue Mission; and the Los Angeles Mission. He also canvassed the area surrounding the freeway by the homeless encampment.

Detective Pere discovered Alegria was receiving some sort of "social services assistance," and he went to the halfway house where Alegria's checks were sent. The person with whom he spoke at the halfway house had never seen Alegria and did not know him. The person said Alegria simply received his checks there, but he never picked them up, and they had an arrangement to send them to the Union Rescue Mission.

On cross-examination, Detective Pere indicated he had not looked for Alegria at food banks or transient hotels. When Detective Pere contacted Alegria for the preliminary hearing, he was very cooperative and did not seem reluctant to appear.

After hearing this evidence, the court wanted to delay ruling so that Detective Pere could follow up with the Union Rescue Mission more thoroughly, as that was where Alegria purportedly picked up his checks. The next morning, Detective Pere returned and testified as follows. He spoke with a supervisor at the Union Rescue Mission the day before. Alegria had checked into the mission in 2000, but he never received a bed and never registered. He did not receive mail there. Detective Pere contacted the Midnight Mission at approximately 7:35 a.m. that morning. Alegria was not registered at that mission. The mail clerk was not there at that time of the morning, and that person would be able to check whether Alegria received mail there. Finally, the detective called the Los Angeles Mission at approximately 7:30 a.m. that morning. No one answered the telephone there.

14

The court ruled the prosecution had shown due diligence in trying to locate Alegria: "They have shown persevering efforts. I do find that the witness, while not what I would call an absolutely critical witness, he is a very important witness; that's one of the aspects. But I also find that they made—in light of the fact that this is a homeless person, that they made genuine efforts to find him; they pursued leads; they made earnest efforts to locate him, including this morning, they told me they went to the Rescue Mission. [¶] I can't, in my mind, determine that there are some other efforts that should have been made and also that it would be very possible that they would find this person." Accordingly, the court found Alegria to be unavailable under Evidence Code section 240 and permitted the prosecution to use his preliminary hearing testimony.

**b. Analysis**

The Sixth Amendment's confrontation clause and California's constitutional confrontation clause guarantee a criminal defendant the right to confront—that is, to cross-examine—the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *People v. Herrera* (2010) 49 Cal.4th 613, 620-621.) But the right of confrontation at trial is not absolute. (*People v. Herrera, supra*, at p. 621.) An exception to confrontation at trial exists when a witness is unavailable, testified at previous judicial proceedings against the same defendant, and was subject to cross-examination then. (*Ibid.*) Accordingly, the court may admit the preliminary hearing testimony of an unavailable witness without violating the defendant's confrontation right. (*Ibid.*)

California statutes codify this exception (Evid. Code, § 1291, subd. (a)(2); *People v. Herrera, supra*, 49 Cal.4th at p. 621) and provide a witness is "unavailable" when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process" (Evid. Code, § 240, subd. (a)). "The constitutional and statutory requirements are 'in harmony.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609.)

Reasonable or due diligence requires that the prosecution make a "'good faith effort'" to obtain the witness's presence at the trial. (*People v. Herrera, supra*, 49

15

Cal.4th at p. 622.) It also ""connotes persevering application, untiring efforts in good earnest [and] efforts of a substantial character.'" (*People v. Wilson* (2005) 36 Cal.4th 309, 341.) "Considerations relevant to this inquiry include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*Ibid.*) The prosecution should show its efforts to locate the witness were reasonable under the circumstances presented. (*People v. Herrera, supra*, at p. 623.)

When, as here, the facts are undisputed, we independently review whether the prosecution's efforts constituted due diligence. (*People v. Smith, supra*, 30 Cal.4th at p. 610.) If we determine the court admitted the witness's testimony in violation of constitutional confrontation rights, we consider whether the error was nevertheless harmless beyond a reasonable doubt. (*People v. Ledesma* (2006) 39 Cal.4th 641, 709.)

Here, the record amply demonstrates the prosecution's due diligence in searching for Alegria. Detective Pere's search was timely—he conducted it in the several weeks leading up to trial. Alegria's testimony was important because he was one of the few witnesses who saw the killing take place. We think in recognition of that fact, the detective's efforts were in good faith, of a substantial character, and persistent. He and others officers repeatedly went to the homeless encampment where the detective last found Alegria. He called telephone numbers and visited addresses that were previously associated with Alegria. He searched an extensive list of governmental agencies for a trace of Alegria. He followed the one lead he had (Alegria's check) to the Union Rescue Mission, but the mission informed him Alegria was not registered there and did not receive mail there. He checked with other missions, even though the lead referenced the Union Rescue Mission.

Appellant contends the detective did not competently explore the lead because he should have checked the log that individuals signed when they picked up mail at the Union Rescue Mission. But there was little reason to believe the log would be relevant, if Alegria was not receiving mail there. Appellant also contends Alegria should have checked transient hotels and food banks. Detective Pere did not have to pursue every

16

conceivable line of inquiry to satisfy his due diligence obligation. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) "It is enough that the People used reasonable efforts to locate the witness." (*Ibid.*) The trial court found due diligence on this record, as do we.

Even if we assume the trial court erred in its due diligence finding, any error in admitting Alegria's testimony would be harmless beyond a reasonable doubt. Rosales's testimony established that Felix was screaming at an African-American man who sat calmly, but when Rosales walked by later, Felix was flat on the ground and that same man was throwing a log at his head repeatedly and saying, "Stop talking your shit." Appellant, who was African-American, had Felix's blood on his pants and socks when the police picked him up three days later. The log found at the scene with Felix's blood on it weighed 20 to 30 pounds. Even excluding Alegria's statements, this other evidence demonstrated appellant was the killer and also showed the requisite circumstances for malice.

## 4. *The Abstract of Judgment Should Reflect a $30 Court Facilities Assessment*

Government Code section 70373, subdivision (a)(1) imposes a $30 court facilities assessment for each felony conviction. The reporter's transcript shows the court imposed the $30 assessment when it pronounced sentence, but the sentencing minute order and abstract of judgment reflect a $40 fee under Government Code section 70373. Appellant contends we must correct the amount of the assessment to $30 in the abstract of judgment, and respondent agrees.

The court's oral pronouncement controls when there is a conflict between the oral pronouncement of judgment and the minute order or the abstract of judgment. (*People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.) We may correct clerical errors at any time, including when the abstract of judgment does not accurately reflect the court's oral pronouncement of sentence. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Accordingly, we shall order the correction of the abstract of judgment.

### DISPOSITION

The abstract of judgment shall be modified to reflect imposition of a $30 assessment pursuant to Government Code section 70373, subdivision (a)(1). The trial

court shall prepare an amended abstract of judgment showing the modification and forward a certified copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


                                    FLIER, J.

WE CONCUR:


            BIGELOW, P. J.



            RUBIN, J.

18